*This opinion is subject to revision before final publication in the Pacific Reporter*

**2026 UT 27**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH, in the interest of J.A.C. and A.E.C., persons under eighteen years of age

C.T.M.,
*Appellant,*

*v.*

STATE OF UTAH,
*Appellee.*

No. 20231128
Heard September 5, 2025
Filed July 30, 2026*

On Certification from the Court of Appeals

Fourth District Juvenile Court, Utah County
The Honorable F. Richards Smith
Nos. 1121825 and 1121829

Attorneys**:

Alexandra Mareschal, Kirstin Norman, Jason B. Richards,
Debra M. Nelson, Salt Lake City, for appellant

Derek E. Brown, Att'y Gen., Deborah A. Wood, John M. Peterson,
Asst. Att'ys Gen., Salt Lake City, for appellee

---

* As of January 31, 2026, "The Supreme Court consists of seven justices." UTAH CODE § 78A-3-101(1). Pursuant to Utah Supreme Court Standing Order No. 18, this court sat and rendered judgment in this matter as a division of five justices.

** Additional attorneys: Emily Adams, Bountiful, Tara Urs, Seattle, Wash., Amy Mulzer, Brooklyn, N.Y., for *amici curiae* Adopted People and Allied Organizations, in support of appellant.

In re J.A.C.

Opinion of the Court

Martha Pierce, Alisha Giles, Heath Haacke, Salt Lake City,
Guardian ad Litem.

———————

ASSOCIATE CHIEF JUSTICE POHLMAN authored the opinion of the
Court, in which CHIEF JUSTICE DURRANT, JUSTICE PETERSEN,
JUSTICE NIELSEN, and JUDGE NEIDER joined.

JUSTICE NIELSEN authored a concurring opinion.

Due to his retirement, JUSTICE PEARCE did not participate herein;
DISTRICT COURT JUDGE CAMILLE L. NEIDER sat.

JUSTICE HAGEN stepped down from the court before this case was
decided. JUSTICE NIELSEN, having reviewed the briefs and listened
to a recording of the oral argument, substituted for JUSTICE HAGEN
and participated fully in this decision.

JUSTICE JORGENSEN and JUSTICE DENT became members of the
Court after oral argument in this matter and did not participate.

———————

ASSOCIATE CHIEF JUSTICE POHLMAN, opinion of the Court:

**INTRODUCTION**

¶1   This child welfare case has spent too many years in our
courts. The two children at the center of this case were first
removed from the parents' custody in 2015 and then again in 2019.
For the past seven years, the children, their foster parents, and
C.T.M. (Mother) have awaited resolution through two trials and
two appeals, with the second appeal making its way to us via
certification by the court of appeals.

¶2   To provide everyone involved the resolution they seek, we
must first answer an important jurisdictional question. The answer
to that question dictates whether we can hear this second appeal
and, if so, whether we can reach every issue Mother raises. We
ultimately conclude that we have jurisdiction over this appeal
generally and over the alleged errors that arose during the second
trial, which occurred after the juvenile court's first termination
decision was reversed by the court of appeals. We don't have
jurisdiction, however, over alleged errors that occurred as early as
2019 and that predate Mother's first appeal.

¶3   Accordingly, our review is limited to Mother's challenges
to the juvenile court's post-remand decision in which it determined
that due to Mother's neglect, her parental unfitness, and the

significant needs of the children, the termination of her parental rights is strictly necessary to promote their best interest. Mother contends, among other things, that the court's termination decision is against the clear weight of the evidence. But for the reasons we explain, we affirm the court's decision, rejecting her claim that it lacks sufficient evidentiary support.

## BACKGROUND[1]

¶4   Mother and father have two children together: fourteen-year-old J.A.C. and eleven-year-old A.E.C.[2] This family has a history with the Division of Child and Family Services (DCFS) and the juvenile court dating back to 2015.

*The 2015 Child Welfare Petition*

¶5   The State first became involved with the family in 2015, after J.A.C., who was then just three, was found wandering alone outside an apartment complex wearing only a dirty diaper and an oversized t-shirt. When responding officers later questioned father about this incident, he told them he had been sleeping all day, so he didn't notice that J.A.C. had gone missing. He also informed the officers that he and Mother have, at times, locked the children in their bedroom by tying an electrical cord around the handle to prevent them from getting out. Officers observed that the children's bedroom was littered with dirty diapers and feces on the walls and floor, and J.A.C. appeared to be developmentally delayed.

¶6   The State removed the children from their home after DCFS made findings of non-supervision, physical neglect, environmental neglect, and general neglect. And the juvenile court later adjudicated the children neglected and abused by their parents. The parents, however, participated in services and made improvements. In 2016, the parents regained custody and the children returned home.

---

[1] "We recite the facts in the light most favorable to the trial court's decision." *In re B.T.B.*, 2020 UT 60, n.3, 472 P.3d 827.

[2] Father is not a party to this appeal because he voluntarily relinquished his rights to the children in 2021. Because this appeal concerns only Mother's parental rights, we mention father only to provide context.

*The 2019 Child Welfare Petition*

¶7 Approximately three years later, the State filed a second petition against Mother and father based on new findings of non-supervision and physical neglect. The allegations in this new petition "mirrored, in many respects, the allegations contained in the 2015 petition." The children once again were found by officers playing in a busy street, unsupervised, and dressed in only their underwear. When the children were taken home, officers watched them crawl through an open window to get inside. And when the State walked through the family's home, it observed trash and "what appeared to be feces" throughout.

¶8 The officers also observed that J.A.C. and A.E.C. appeared developmentally delayed, with A.E.C. (at five years old) being nonverbal. When speaking to school personnel, officers discovered that J.A.C. (at seven years old) was not potty trained and often went to school unbathed and dirty. School personnel reported that they would send J.A.C. home with his soiled clothes after an accident, and those clothes would remain in his backpack for several days.

¶9 At an initial pretrial hearing before the juvenile court, Mother appeared and explained that the children were in father's custody because "in a few days she would be leaving the country and traveling to Turkey to pursue a romantic relationship." She said that she did not know how long she would be gone, but estimated it could be longer than a year, and that she didn't intend to return to the United States until after her fiancé was able to obtain a green card. The court excused Mother from the case and proceeded without her while she was out of the country.

¶10 As the case progressed, the court authorized the State to remove the children from father's custody because of his failure to address conditions in the home and to properly care for the children. The children were eventually placed with a foster family in Tennessee that was willing and wanting to adopt them. When Mother was notified by the State of the children's removal from father's home, she "appeared unconcerned and stated she had no intentions of returning to the U.S. anytime soon."

¶11 The juvenile court later adjudicated the State's petition for custody against the parents, finding that the children were neglected as to both Mother and father. In the court's findings, it established non-supervision of the children, a chronically unsafe and unsanitary home condition, a failure to meet the children's hygienic needs, and other issues of neglect.

¶12 With the adjudication complete, the court held a disposition hearing and set "return home" as the permanency goal for the children along with an order for the State to provide reunification services to the parents. As father was the only parent in the country at the time, the reunification goal was focused on him. In October 2020, approximately one year after she left the country, Mother returned to the U.S.

¶13 After attempting reunification, the juvenile court held a hearing in February 2021 to reassess the children's permanency goal. After hearing from the parties, it terminated reunification services as to father and changed the primary permanency goal to adoption. Shortly thereafter, in March 2021, the State filed a termination petition for the parental rights of Mother and father as to both children. Only then, in April 2021, did Mother begin accessing services.

*The First Trial & August 3 Termination Order*

¶14 The first trial on the State's petition to terminate Mother's parental rights was held in the summer of 2021. As to grounds for termination, the court determined that Mother neglected the children and was unfit or incompetent. In support of its determination, the court found, among other things, that Mother demonstrated a disregard for the welfare of her children; she had an unwillingness or inability to ensure the children's most basic needs were met; she did not have basic insight into her children's needs and did not take responsibility for her role as a parent to ensure their wellbeing; and her "commitment to and interest in the children is not what would be expected of a normal parent." The court also determined that it was in the "children's best interest that the mother's parental rights be terminated, and termination is strictly necessary to promote the children's welfare and best interest." Finally, the court found that J.A.C. and A.E.C. had suffered severe chronic neglect that has detrimentally impacted their development, and it found that further exposure to such neglect while waiting for the possibility that Mother would develop sufficient skills to adequately parent them would be harmful.

¶15 The juvenile court ordered Mother's parental rights permanently terminated on August 3, 2021 (August 3 order). Although the court stated that it had considered alternatives to the termination of Mother's rights and had determined that termination was strictly necessary to promote the welfare and best

interest of the children, the court did not describe what alternatives it had considered or why it found them inadequate.

*The First Appeal*

¶16 Mother's counsel filed a notice of appeal from the termination order on August 17, but counsel filed the notice in the court of appeals instead of filing it in the juvenile court. Because counsel filed the notice in the wrong court, he re-filed the notice in the juvenile court on August 23, twenty days after the juvenile court's termination order was entered, which was beyond the fifteen days allowed by rule. *See* UTAH R. APP. P. 52(a).

¶17 Because the notice of appeal was untimely, the court of appeals noticed the appeal for summary disposition on the basis that the court lacked jurisdiction over the appeal. The State and the guardian ad litem (GAL) agreed that the court lacked jurisdiction; Mother's counsel argued that his mistake should not deprive Mother of her constitutional right to appeal. The court of appeals rejected counsel's plea and dismissed the appeal for lack of jurisdiction.

¶18 Undeterred, Mother filed a motion in the juvenile court seeking to set aside and re-enter the August 3 order under rule 60(b)(1) of the Utah Rules of Civil Procedure, so that her time to appeal would be reset. *See* UTAH R. CIV. P. 60(b)(1) ("On motion and upon just terms, the court may relieve a party . . . from a judgment, order, or proceeding for the following reasons: (1) mistake . . . or excusable neglect . . . ."). Over the State's objection, the court granted Mother's motion. It set aside its August 3 order and deemed it "re-entered," effective December 3, 2021 (December 3 order). Mother then filed a notice of appeal in the juvenile court identifying the December 3 order as the subject of her appeal.

¶19 Along with her notice of appeal, Mother filed a petition on appeal as required by rule 55(a) of the Utah Rules of Appellate Procedure. In her petition, Mother identified two issues for appeal: (1) whether the juvenile court erred in discrediting a mental health assessment and Mother's therapist's testimony in considering her fitness to parent; and (2) whether the juvenile court erred in determining it was strictly necessary to terminate parental rights where (according to Mother) termination was not warranted, Mother's parenting was improving, Mother had substantially complied with DCFS's requests, and the children were not in an adoptive placement.

¶20 In response, the State argued that the court of appeals lacked jurisdiction over Mother's appeal of the August 3 order because the notice was filed too late. Citing court of appeals' authority, the State argued that because the juvenile court did not substantively change its August 3 order, the court's December 3 re-entry of that order did not reset the time for filing an appeal. (Citing *Foster v. Montgomery*, 2003 UT App 405, ¶ 18, 82 P.3d 191.)

¶21 The court of appeals subsequently issued an order notifying the parties that the case was being considered for summary dismissal due to a lack of jurisdiction for the reasons stated in the State's response to Mother's petition. In responding to the court's order, Mother argued that because her constitutional rights were implicated, equities weighed in favor of "honoring" the juvenile court's decision to set aside and reinstate its August 3 order so that she could timely file her appeal. Mother also argued that the court should adopt a method for appellants to reinstate their rights to appeal in parental termination proceedings.

¶22 The court of appeals withdrew its notice of summary disposition and ordered the parties to proceed to full briefing, instructing that "[i]n addition to the issues raised on appeal, the parties shall specifically address whether Utah Appellate Courts should adopt some method for parents to reinstate their right to appeal or whether *Manning* should be extended to termination of parental rights proceedings." (Citing *Manning v. State*, 2005 UT 61, 122 P.3d 628, *superseded by rule as stated in State v. Brown*, 2021 UT 11, ¶ 15, 489 P.3d 152.)

¶23 Although the case was originally set to be briefed within three months, a host of motions delayed the proceeding for more than a year. Then, before Mother's principal brief was filed, the parties filed a stipulated motion asking the court of appeals to refer the appeal to mediation. Mother represented that mediation would "assist in the resolution of this case without an appeal and lead to a permanent solution for all parties more expeditiously."

¶24 The court of appeals granted the parties' request and the parties returned to the court several weeks later with a "stipulated motion to reverse and remand." Invoking rule 10 of the Utah Rules of Appellate Procedure,[3] the parties asserted that the juvenile court

---

[3] Rule 10 allows for a summary reversal "in cases of manifest error." UTAH R. APP. P. 10(a)(2). The parties did not allege manifest

(continued . . .)

had "committed reversible error by failing to adequately discuss how it considered, and why it ultimately rejected, alternatives to termination." And they asked the court of appeals to reverse the juvenile court's August 3 order "with respect to its best interest analysis and enter a limited remand for further analysis of best interest." Noting that significant time had passed since that order was entered, they also asked that the juvenile court be instructed to conduct its inquiry based on the children's current situation and needs. Finally, although the parties acknowledged that "questions about appellate jurisdiction [had been] raised" on appeal, they did not discuss those questions further.

¶25 The court of appeals granted the parties' request and ordered "that the juvenile court's order terminating Mother's parental rights is reversed." In its "Order of Reversal and Remand," the court agreed with the parties' assessment that the "findings below were insufficient given recent case law." And it ordered the juvenile court "to explain in greater detail why termination of Mother's parental rights is, or is not, in the children's best interests at this time and what, if any, viable alternatives to termination exist." The court of appeals did not mention the jurisdictional question raised at the outset of the appeal.

¶26 Several weeks later, the court of appeals remitted the case to the juvenile court. *See* UTAH R. APP. P. 36(a)(2) ("The Court of Appeals will issue a remittitur immediately after the time for filing a petition for writ of certiorari expires.").

*The Second Trial & December 17 Termination Order*

¶27 On remand, the juvenile court held a second trial to take evidence as to the then-current best interest of J.A.C. (at eleven years old) and A.E.C. (at nine years old). The court heard testimony from Mother, J.A.C. and A.E.C., the children's foster mother, a DCFS caseworker, the children's case manager from the state of Tennessee, a therapist that had sessions with Mother, and Mother's now-husband.

¶28 Trial ended on November 3, and on December 17, 2023, the court entered findings of fact and conclusions of law, explaining in greater detail why termination of Mother's parental rights was in the children's best interest, including why termination was strictly

---

error, but we assume they believed this provision provided a procedural basis for their joint request for reversal.

necessary (December 17 order). Based on the evidence presented, the court found that the children had "made important progress" in the two years with their foster family, but that they still had significant medical, developmental, and educational needs. For example, J.A.C. continued to require incontinence briefs and was on an individualized education program in school to accommodate his special needs. And although he still struggled at school, he had progressed from "hardly read[ing] at all" before his placement to reading at a third-grade level. As for A.E.C., the court found that he had ADHD and required constant adult supervision to complete homework. A.E.C. also continued to face challenges with everyday tasks, such as tying his shoes, holding a toothbrush, and writing.

¶29 The court further found that both children required care from numerous healthcare providers to address their medical and developmental needs, and that the foster parents used their own income to pay for some of their services. The needs of the children were so great that the foster mother left her job "so that she can devote the necessary time to provide the care they need." However, despite these challenges, the court found that the children were fully integrated into and connected at an emotional level with the foster family, and that the foster parents were "hands-on," "very patient and calm," knew the children's needs, and were "proactive in addressing them." Finally, the court found that the foster family was committed to adopting the children should that option become available.

¶30 With regard to Mother, the juvenile court found that she was largely "oblivious" to the challenges J.A.C. and A.E.C. continue to face and their associated needs. It found Mother was "uninterested" in their progress and wellbeing, as she never really asked about them and instead focused her interactions with the children on "having fun and giving gifts." And the court detailed Mother's poor judgment about child safety, should the children return home to live with her, as demonstrated by Mother's lack of concern over her plans to share her home with a person who has been convicted of a sex crime against a minor.

¶31 The court also made findings about Mother's lack of parenting skills and her failure to make a genuine effort to improve herself and to address the issues that led to the children's removal. The court found that Mother only briefly engaged in therapy, and that she "chooses to be uninformed about [her children's] development, physical and emotional wellbeing, and special

needs." And the court found that she "is either unwilling or incapable of making necessary changes," and that it would be detrimental to the children to return to her custody. The court also found that with Mother, the children's "special needs would not be addressed," "their basic needs would be neglected," and "[t]hey would regress in the progress they have made since their removal."

¶32 The juvenile court also made findings about the children's own desires after hearing the testimony they wanted to share with the court. A.E.C. expressed his view that he wanted to live in his home in Tennessee with the foster family and that he didn't want to live in Utah again. And while J.A.C. had previously expressed the desire to stay in Tennessee with the foster family, the night before trial, he told the GAL that he wanted to give Mother "one more chance." He thought Mother's new husband, whom he didn't know very well, would help Mother make better choices than she had in the past. And although J.A.C. said he wanted to live with Mother, he wanted to do so if he could also have daily contact with his foster family. He also said that Mother wasn't allowed to buy him presents that cost more than $30, that she lets him have "a lot more screen time," and that he wasn't "super thrilled" with the foster parents' screen time rules.

¶33 Based on these testimonies, the court found that the children had the capacity to relate their experiences with Mother and the foster family, as well as their feelings resulting from those experiences. But the court gave "minimal weight" to J.A.C.'s change of heart about adoption, finding it was likely that he was at least partially motivated by a desire for more screen time and his perception that Mother is "all about fun and gifts." In making its findings, the court determined that given the children's ages and development, they lacked sufficient capacity to express "meaningful opinions" about their case's "ultimate outcome."

¶34 Finally, the court considered alternatives to terminating Mother's parental rights. It considered awarding permanent custody and guardianship to the foster parents but concluded such an arrangement wouldn't "equally protect[] and benefit[]" the children. It found that the foster parents and Mother had a strained relationship that would likely get worse under permanent custody and guardianship because Mother was unable to adhere to the foster parents' rules or boundaries. The court also found that permanent custody and guardianship would likely confuse the children because they lacked the capacity to distinguish between

guardian and parent. And this confusion would only be exacerbated by Mother's intrusion on boundaries and her lack of respect for the family's rules. Last, it found that the foster parents had demonstrated a willingness to work with Mother, but that it was "imperative that they have full authority to set and enforce appropriate limits." The court found those limits "cannot be satisfactorily achieved through permanent custody and guardianship, and such an arrangement would prove detrimental to the children."

¶35 Based on these findings, the court concluded that the termination of Mother's parental rights was in the best interest of the children and that termination of Mother's parental rights was strictly necessary to promote the children's welfare and best interest. Thus, the court granted the State's petition and permanently terminated Mother's parental rights.

*The Second Appeal*

¶36 On December 22, Mother filed a notice of appeal from the juvenile court's termination order. In her notice, she didn't correctly identify the December 17 order by name, but she states that she is appealing the findings of fact and conclusions of law entered by the juvenile court after its order of November 3.

¶37 Despite the limitation in her notice of appeal, in her subsequently filed petition on appeal, Mother purports to appeal the court's pre-remand August 3 order, as well as its post-remand December 17 order. And in addition to the juvenile court's December 17 best interest determination, Mother purports to appeal alleged errors relating to DCFS's reunification efforts and alleged errors that she identifies as having occurred as early as 2019.

¶38 The GAL contests Mother's challenges to the juvenile court's best interest determination, but the GAL also identifies several potential barriers to review generally. First, the GAL revisits the jurisdictional deficiency tied to the original, untimely notice of appeal, and it argues that we lack jurisdiction over this appeal. The GAL also contends that even if we can hear Mother's challenge to the December 17 order, we either cannot or should not consider Mother's other challenges because we lack jurisdiction to hear them or because they are unpreserved.

¶39 The State similarly raises the issue of jurisdiction, arguing that the initial appeal from the August 3 order was untimely and

the juvenile court improperly used rule 60(b) to extend the time to file an appeal. Unlike the GAL, however, the State invites the court to craft a *Manning*-like remedy exclusively for this case to excuse its jurisdictional defect. The State also defends the juvenile court's best interest determination, and it argues that whatever procedural errors may have occurred early in this case were harmless.

¶40 Finally, in reply, Mother addresses jurisdiction, arguing that the challenge to jurisdiction was implicitly resolved by the court of appeals when it reversed the juvenile court and remanded the appeal for a new trial. And relatedly, Mother argues that any challenge to jurisdiction should have been raised in "the prior appeal" and is now waived. Mother further argues that the juvenile court entered a new order terminating Mother's rights, and that the August 3 order "does not spring back to life after reversal . . . simply because the juvenile court later came to the same conclusion."[4] Mother also rejects the State's suggestion that a *Manning*-type remedy is necessary, and she insists that she should be allowed to raise errors that occurred as far back as 2019, and prior to adjudication, because they are "structural." Last, Mother asserts that raising these errors in the juvenile court after remand "would have violated" the court of appeals' "mandate on remand, which was limited to additional findings for best interests."

¶41 After Mother's appeal was fully briefed, the court of appeals certified the case to us. *See* UTAH CODE § 78A-4-103(5). In its certification order, the court of appeals identified several issues that it believed this court should settle, including "whether an untimely notice of appeal that went unaddressed prior to remand in an initial appeal deprives the appellate court of jurisdiction in a timely subsequent appeal in the same matter."

## ISSUES AND STANDARDS OF REVIEW

¶42 We must first resolve the question of whether we have appellate jurisdiction over Mother's appeal. *See State v. Brown*, 2021 UT 11, ¶ 10, 489 P.3d 152 ("We have an independent obligation to ensure that we have [jurisdiction] over all matters before us."

---

[4] Although Mother included the August 3 order in her petition on appeal, she now contends that the "2021 Termination Order has no bearing on jurisdiction over this appeal at this point. To hold otherwise would be procedurally unsound and a colossal waste of judicial resources and precious time for these children and their family."

(cleaned up)). "Whether this court has jurisdiction over an appeal is a question of law that can be raised for the first time on appeal." *In re Adoption of A.B.*, 2010 UT 55, ¶ 21, 245 P.3d 711.

¶43   We ultimately determine that we have jurisdiction to hear Mother's challenge to the juvenile court's termination decision in its December 17 order. "Whether a parent's rights should be terminated presents a mixed question of law and fact." *In re E.R.*, 2021 UT 36, ¶ 7, 496 P.3d 58 (cleaned up). We will not overturn a parental termination decision unless it is against the clear weight of the evidence. *In re D.S.*, 2025 UT 11, ¶ 34, 568 P.3d 1060.

## ANALYSIS

¶44   The GAL and the State both raise jurisdictional concerns stemming from Mother's untimely appeal of the juvenile court's August 3 order. We ultimately conclude that we have appellate jurisdiction to hear Mother's challenge to the December 17 order, but that our jurisdiction is limited to reviewing alleged errors that occurred after remand from the first appeal. Thus, we reach Mother's contention that the juvenile court erred in terminating her parental rights because doing so was not in the best interest of the children nor strictly necessary to promote their best interest.

¶45 As we explain below, we affirm the juvenile court's decision to terminate Mother's parental rights to the children because she has not shown error in the court's decision or that the decision "is against the clear weight of the evidence." *In re D.S.*, 2025 UT 11, ¶ 46, 568 P.3d 1060 (cleaned up).

I.   APPELLATE JURISDICTION

¶46   We must first address the jurisdictional uncertainty that clouds this appeal. After all, even when an appeal raises important questions that deserve our attention, "we cannot turn a blind eye to [a] defect in our appellate jurisdiction." *State v. Brown*, 2021 UT 11, ¶ 9, 489 P.3d 152; *see also State v. Collins*, 2014 UT 61, ¶ 21, 342 P.3d 789 ("Appellate courts do not enjoy unlimited power to review the actions of trial courts and cannot conjure jurisdiction." (cleaned up)).

¶47   The State and the GAL argue that Mother's appeal lacks solid jurisdictional footing in this court, because Mother did not

timely file her notice of appeal in the juvenile court.[5] And although the State and the GAL once invoked the court of appeals' jurisdiction to reverse the juvenile court's August 3 order, they now claim that the jurisdictional defect tied to the untimely notice still taints these proceedings and proscribes our review.[6]

¶48  For her part, Mother argues that our jurisdiction is secure. She doesn't claim the notice of appeal was timely or that the time to appeal was extended by the juvenile court's reentry of its August 3 order in December 2021. Instead, she contends that any outstanding challenge to the court of appeals' jurisdiction was waived when the court of appeals, without challenge from the parties, implicitly resolved the issue by exercising its jurisdiction to reverse the juvenile court.

¶49 To resolve this jurisdictional dilemma, we begin by examining the origins of this appeal and the circumstances surrounding the court of appeals' reversal of the juvenile court's August 3 order. As we explain, we ultimately conclude that under our precedent, Mother has the better of the two arguments. We then address how that conclusion affects the scope of this appeal. And although we decide that we have jurisdiction to review Mother's

---

[5] The parties' briefs were filed in the court of appeals and thus their challenges to appellate jurisdiction were originally directed at that court. But because the court of appeals certified this case to our court "for original appellate review and determination," the question of appellate jurisdiction remains. UTAH CODE § 78A-4-103(5). The court of appeals can certify only those matters over which it has "original appellate jurisdiction." *Id.* Thus, if the court of appeals lacked jurisdiction over Mother's appeal, it lacked the authority to certify her case to us and the case must be dismissed. *See State v. Sun Sur. Ins.*, 2004 UT 74, ¶ 9, 99 P.3d 818 ("Where an appeal is not properly taken, an appellate court lacks jurisdiction and must dismiss." (cleaned up)).

[6] The State suggests that we *could* exercise jurisdiction to hear this appeal, but only if we grant Mother an exception to the jurisdictional bar by fashioning "an ad hoc *Manning*-like remedy." (Citing *Manning v. State*, 2005 UT 61, 122 P.3d 628, *superseded by rule as stated in State v. Brown*, 2021 UT 11, ¶ 15, 489 P.3d 152.) It otherwise asserts that this court "wholly lacks jurisdiction over this appeal because the initial notice of appeal . . . was untimely."

challenges to the juvenile court's December 17 order, we conclude that her remaining challenges are beyond our reach.

*A. Mother Filed an Untimely Appeal; But, with the Parties' Stipulation, the Court of Appeals Exercised Its Jurisdiction to Reverse the Juvenile Court*

¶50 Our jurisdictional inquiry begins with an untimely notice of appeal. No one disputes that Mother's appeal of the juvenile court's August 3 order, which wasn't filed in the juvenile court until August 23, was filed too late. *See* UTAH R. APP. P. 52(a) (requiring an appeal from an order terminating parental rights to be filed within fifteen days of the entry of the order); *id.* R. 53(a) ("A notice of appeal filed pursuant to Rule 52(a) must be filed with the clerk of the juvenile court where the order was entered."). As a result, Mother failed to timely invoke the court of appeals' jurisdiction, and her appeal was properly dismissed. *See Trapnell & Assocs., LLC v. Legacy Resorts, LLC*, 2020 UT 44, ¶ 35, 469 P.3d 989 (stating that the filing of a timely notice of appeal in the trial court is a "procedural prerequisite to invoking appellate court jurisdiction" (cleaned up)); *see also id.* ("An appellate court simply has no power to hear the case if a notice of appeal is untimely." (cleaned up)).

¶51 Mother, however, did not relent. She returned to the juvenile court and asked it to grant her relief under rule 60(b)(1) of the Utah Rules of Civil Procedure for her counsel's "mistake" or "excusable neglect." The State objected, but the court granted her relief. Citing rule 60(b), the court set aside and then re-entered the August 3 order "effective as of December 3, 2021." Mother then filed a second notice of appeal, this time identifying the December 3 order as the operative order.

¶52 Now back in the court of appeals, the State raised a jurisdictional alarm. It explained that the court had already correctly dismissed the appeal for lack of jurisdiction based on an untimely notice of appeal. The State then cited *Foster v. Montgomery*, 2003 UT App 405, 82 P.3d 191, and argued that because the juvenile court did not substantively change its August 3 order, its re-entry of that order could not reset Mother's time to file her appeal. *Id.* ¶ 18 ("Where a judgment is reentered, and the subsequent judgment does not alter the substantive rights affected by the first judgment, the time for appeal runs from the first judgment." (cleaned up)).

¶53 The court of appeals saw at least some initial merit in the State's position, and it notified the parties that it was considering dismissing the case on the basis that the court "appears to lack jurisdiction" for the reasons the State argued. In response, Mother argued that the juvenile court had the authority to set aside and re-enter its August 3 order, and that the equities favored "honoring" the juvenile court's decision so that she could file a timely notice of appeal. She also argued that the court should "adopt" a "method" to allow for the reinstatement of the time to appeal from termination proceedings or "expand the rule in *Manning*."

¶54 Shortly after Mother filed her response, the court of appeals withdrew its notice of summary disposition. Without expressing its view on the jurisdictional question, it asked the parties to address, as part of their merits briefing, the suggestion made by Mother that a rule be created, or *Manning* be extended, to allow for the reinstatement of the time to file an appeal in parental rights proceedings.

¶55 The parties, however, never fully briefed the appeal. They instead mediated their dispute and eventually filed a stipulated motion in which they agreed that the juvenile court had "committed reversible error by failing to adequately discuss how it considered, and why it ultimately rejected, alternatives to termination." Based on their agreement, the parties asked the court of appeals to reverse the August 3 order and "enter a limited remand for further analysis of best interest" based on the children's current situation and needs. The parties noted that a question about the court of appeals' jurisdiction had been previously raised, but they did not suggest that the court lacked the authority to reverse the juvenile court.

¶56 The court of appeals granted the parties' request and reversed the juvenile court's August 3 order terminating Mother's rights. The court of appeals agreed with the parties that the juvenile court's best interest findings were insufficient, and it returned the matter to the juvenile court to conduct a present-tense analysis of the children's best interest. In reversing the juvenile court, the court of appeals did not address the jurisdictional question that had been raised earlier in the appeal.

¶57 None of the parties sought certiorari review of the court of appeals' order reversing the juvenile court. After the time for filing a petition for a writ of certiorari had expired, the court of appeals remitted the case to the juvenile court. The juvenile court then held

a second trial to reconsider its decision based on the children's then-current best interest.

¶58   With this procedural history well in mind, we now address the State's and the GAL's contention that this court lacks jurisdiction to hear Mother's appeal.

*B. Our Precedent Requires that We Reject the Jurisdictional Challenge*

¶59 We begin this discussion with an unremarkable observation: when an appellate court lacks jurisdiction due to an untimely notice of appeal, the court has only one choice—it must dismiss the appeal. *See Trapnell*, 2020 UT 44, ¶ 35; *see also, e.g.*, *Bradbury v. Valencia*, 2000 UT 50, ¶ 8, 5 P.3d 649 ("Where an appeal is not properly taken, this court lacks jurisdiction and we must dismiss."); *Workers Comp. Fund v. Argonaut Ins.*, 2011 UT 61, ¶ 10, 266 P.3d 792 ("It is axiomatic in this jurisdiction that failure to timely perfect an appeal is a jurisdictional failure requiring dismissal of the appeal." (cleaned up)); *In re Adoption of E.M.F.*, 2022 UT App 43, ¶ 16, 509 P.3d 214 (recognizing the court had "no choice but to dismiss" an appeal where the notice of appeal was untimely).

¶60   The court of appeals honored this rule when it originally dismissed Mother's appeal as untimely. And it came close to doing so a second time when, after the juvenile court re-entered the August 3 order, the court of appeals notified the parties that it was considering dismissing the appeal again for an apparent lack of jurisdiction. Ultimately, however, the court of appeals did not *expressly* address the jurisdictional question. Instead, it *implicitly* concluded that it had jurisdiction over Mother's appeal when it granted the parties' stipulated motion and reversed the juvenile court. *Cf. In re K.F.*, 2009 UT 4, ¶ 21, 201 P.3d 985 (identifying jurisdiction as a "threshold issue" that must be addressed before the court makes substantive rulings); *Greyhound Lines, Inc. v. Utah Transit Auth.*, 2020 UT App 144, ¶ 24, 477 P.3d 472 ("A challenge to appellate jurisdiction presents a threshold issue that we must resolve before we may address the appellant's substantive issues." (cleaned up)).[7]

---

[7] We pause to note that the reversal was a substantive ruling on the merits—even if it was based on the parties' stipulation. The parties did not seek a *dismissal* of the appeal—they sought a *reversal*

(continued . . .)

¶61 After the court of appeals' remand, the parties re-tried their dispute over the children's best interest in the juvenile court, apparently without any question being raised about the court of appeals' authority to order a redo. But after Mother again appealed the juvenile court's termination decision to the court of appeals, the jurisdictional question resurfaced.

¶62 The GAL argues that because of the original jurisdictional defect, the present appeal must be dismissed. Citing the untimely notice of appeal of the August 3 order and rejecting the juvenile court's rule 60(b) order as ineffective, the GAL argues that the court of appeals had no authority to reverse the juvenile court for further proceedings. According to the GAL, because the court of appeals had jurisdiction only to dismiss Mother's original appeal, it could not reverse the juvenile court and order a second trial, and thus the appellate courts now lack jurisdiction over a second appeal.

¶63 Similarly, the State argues that "there remains a question as to whether [the court of appeals] had appellate jurisdiction over this appeal at all from its inception." And although the State invites us to excuse Mother's untimely notice by creating a one-time *Manning*-like remedy, it agrees that the GAL's assessment of the appeal's jurisdictional defect is correct.

¶64 Mother, however, defends our jurisdiction. She argues that the court of appeals necessarily resolved the question in favor of having jurisdiction over her first appeal when it reversed the August 3 order. She also argues that "[t]he time to raise the jurisdictional issue the GAL now complains of was in the prior appeal" when the issue was first identified. She insists that because none of the parties challenged the court of appeals' implicit conclusion that it had jurisdiction over the first appeal, the issue was waived and our jurisdiction over the second appeal is sound.

¶65 At first blush, the GAL's (and the State's) position has some appeal. After all, we often say that "acquiescence of the parties is insufficient to confer jurisdiction on the court, and a lack of jurisdiction can be raised by the court or either party at any time." *A.J. Mackay Co. v. Okland Constr. Co.*, 817 P.2d 323, 325 (Utah 1991); *see also Utah Down Syndrome Found., Inc. v. Utah Down Syndrome Ass'n*, 2012 UT 86, ¶¶ 7, 24, 293 P.3d 241 (same). But the circumstances before us are unusual. The question before us is not

---

of the juvenile court's order. And they could not achieve that result without the court of appeals exercising its jurisdiction.

simply whether the court of appeals had jurisdiction over Mother's appeal after the first trial in 2021. Instead, the question is whether the alleged jurisdictional defect that existed *before* reversal and remand could deprive us of jurisdiction now after the second trial in 2023.[8]

¶66 As unusual as this question is, this court has already answered it. Although Mother did not cite *A.S. v. R.S.*, 2017 UT 77, 416 P.3d 465, her argument for us exercising our jurisdiction is supported by this precedent.

¶67 *A.S.* involved dueling petitions to terminate parental rights arising out of a divorce proceeding in district court. *Id.* ¶ 2. Ultimately, the juvenile court (which assumed jurisdiction over the termination petitions) denied the father's petition to terminate the mother's parental rights and granted the mother custody of their children. *Id.* As part of its order, the court cited the father and stepmother for contempt and ordered them to pay the mother's legal fees and costs. *Id.* Because the father and stepmother appealed the juvenile court's order before the award of fees and costs had been reduced to a judgment, the appeal was premature and thus did not invoke the court of appeals' jurisdiction. *Id.* ¶ 3.

¶68 "[A]pparently unaware that the order appealed from was not a final order," the court of appeals failed to dismiss the appeal and instead issued an opinion affirming the order in part and vacating the order on the issue of contempt. *Id.* The court of appeals remanded the case to the juvenile court for a hearing on the contempt allegations. *Id.*

¶69 When the case eventually returned to this court following further litigation in the trial courts, this court concluded that despite the jurisdictional defect in the first appeal, the parties were "foreclosed from arguing that the court of appeals lacked jurisdiction" to issue its decision vacating the juvenile court's contempt order. *Id.* We explained that "[b]ecause the time to petition for writ of certiorari on the court of appeals' opinion ha[d] lapsed," we would "treat [the decision] as a final judgment." *Id.*

¶70 In support of that decision, we explained that although the court of appeals should have rejected the appeal for lack of

---

[8] We say "alleged" defect because to resolve this question, we need not definitively resolve whether the court of appeals had jurisdiction when it reversed the juvenile court's August 3 order.

jurisdiction because the juvenile court's order was not final, "there is now no remedy for the error." *Id.* ¶ 3 n.2. We acknowledged that ordinarily, "jurisdiction is a threshold issue, which can be raised at any time and must be addressed before turning to the merits of other claims." *Id.* (cleaned up). But we held that "the ability to raise questions of jurisdiction expires after the last available opportunity to appeal final judgments on a particular set of issues has passed." *Id.* We reasoned that "this comports with our *res judicata* doctrine precluding claims after a final judgment on the merits in a previous action." *Id.* (cleaned up); *see also Grand Cent. Mining Co. v. Mammoth Mining Co.*, 104 P. 573, 576 (Utah 1909) ("[B]ecause of the action taken by us on the former appeal, in assuming jurisdiction and reviewing the judgment appealed from . . . we necessarily held and adjudicated that the judgment so appealed was final and appealable. Such an adjudication became the law of the case, from which neither we nor the litigants can depart on a second appeal, or any subsequent proceedings . . . .").

¶71 Applying the same reasoning here, we must conclude that when the time to challenge the court of appeals' order reversing the August 3 order had passed, the GAL (or any party) lost the ability to challenge the alleged defect in the court of appeals' jurisdiction. The parties could have insisted that the court of appeals expressly resolve the jurisdictional dispute before reversing the juvenile court. Or, if they believed the court of appeals had erred in exercising its jurisdiction, they could have filed a petition for certiorari. But the ability to challenge a jurisdictional defect does not extend forever. *A.S.* tells us that once the time to petition for writ of certiorari has passed, we treat the order as final and a jurisdictional challenge is foreclosed. *See* 2017 UT 77, ¶ 3 & n.2.

¶72 Having reached this conclusion, we reject the GAL's contention that this entire case must be dismissed due to an alleged pre-remand jurisdictional defect in the court of appeals. But in rejecting that challenge, we must assess whether we have jurisdiction to address all of Mother's challenges. *See Trapnell*, 2020 UT 44, ¶ 31 ("We have an independent obligation to ensure that we have jurisdiction over all matters before us and do not take lightly our responsibility to ensure we have proper jurisdiction before deciding a case."); *see also Copper Hills Custom Homes, LLC v. Countrywide Bank, FSB*, 2018 UT 56, ¶ 25, 428 P.3d 1133 (dismissing a portion of an appeal for want of appellate jurisdiction); *Zion Vill. Resort LLC v. Pro Curb U.S.A. LLC*, 2020 UT App 167, ¶ 21, 480 P.3d 1055 (explaining that if appellate jurisdiction is lacking "with

regard to a particular issue, we must dismiss the appeal of that issue" (cleaned up)).

*C. We Have Jurisdiction to Hear Mother's Appeal of the December 17 Order; We Do Not Have Jurisdiction to Hear Challenges Based on Errors Predating that Order*

¶73  Although we have rejected the GAL's contention that we lack jurisdiction over this appeal in its entirety, that decision does not endorse Mother's contention that we have jurisdiction to hear every issue she raises. We will first identify the order that is properly before us and the issues we have jurisdiction to decide. We will then identify the issues we lack jurisdiction to review and explain why those issues are beyond our review.

¶74  First, we conclude that we have jurisdiction to review the juvenile court's December 17 order. Aside from the arguments arising out of the pre-remand defect in the court of appeals' jurisdiction, no one has suggested that Mother's appeal from the December 17 order was not perfected. And our own independent review does not reveal any infirmity. Mother filed her notice of appeal in the juvenile court on December 22—well within the fifteen-day deadline allowed by the rules. *See* UTAH R. APP. P. 52(a) ("A notice of appeal from an order in a child welfare proceeding . . . must be filed within 15 days of the entry of the order appealed from."). And although she does not identify the exact name of the December 17 order, it is apparent from the notice she is appealing that order.[9] Thus, we have jurisdiction to review (and do review) her challenges to the December 17 order—the juvenile court's post-remand determination that termination of her parental rights, from

---

[9] In her notice of appeal, Mother states that she is appealing from "the Findings of Fact and Conclusion of Law Terminating Parental Rights, Order regarding Permanent Custody and Guardianship and Termination of Parental Rights filed in this matter, after the Order, entered on November 3, 2023." The December 17 order is titled, "Additional Findings of Fact Regarding Best Interests, Conclusions of Law, and Order." We are unaware of an order in the case with the title Mother identifies. But because the December 17 order resembles in content and title the order noticed, and because the December 17 order is the only order terminating parental rights entered after the second trial ended on November 3, 2023, we interpret Mother's notice of appeal as appealing the December 17 order.

the children's point of view, was strictly necessary to promote their best interest. *See infra* Part II.

¶75 Second, we conclude that we lack jurisdiction to review Mother's challenges based on alleged errors that occurred before the first appeal. Specifically, we conclude we don't have jurisdiction to review Mother's due process challenges, including her argument about the juvenile court's failure to appoint legal counsel for Mother before she left the country in 2019. We also lack jurisdiction to review Mother's contention that the juvenile court erred in determining that DCFS made reasonable efforts towards reunification when, according to Mother, the court and DCFS erroneously believed that reunification services had not been ordered for Mother. Finally, because Mother's claim of cumulative error is based on alleged errors over which we lack jurisdiction, we cannot reach it.

¶76 The most obvious reason we lack jurisdiction over these issues is that the errors about which Mother complains predate but were not raised in the first appeal. Having accepted Mother's argument that the GAL is foreclosed from challenging an alleged jurisdictional error that predated the court of appeals' reversal and remand, we see no basis to conclude that Mother is not likewise foreclosed from challenging other alleged errors that also predate that reversal.

¶77 In *A.S.*, the court concluded that once the opportunity to challenge an error in the first appeal had passed, the error could not be challenged in a later appeal. 2017 UT 77, ¶ 3 & n.2. We treated the court of appeals' first decision as a "final judgment," and observed that this treatment comported with our res judicata doctrine, *id.*, which furthers "the goals of judicial economy and finality," *IHC Health Servs., Inc. v. D&K Mgmt., Inc.*, 2008 UT 73, ¶ 26, 196 P.3d 588. Here, foreclosing the GAL and the State from challenging the court of appeals' jurisdiction in the first appeal comports with those twin goals. And so does foreclosing Mother's challenges to errors that could have been raised, if at all, in the first appeal.

¶78 Mother tried to avoid this result when, during oral argument, she suggested that she had reserved in the court of appeals the right to bring these issues should there be a second appeal after remand. But even assuming a party could reserve appellate issues following a reversal and remand based on a stipulation, Mother did not do so here. There is no mention in the

parties' stipulated motion or in the court of appeals' order of reversal that the parties had agreed that Mother could reserve any issues for a post-remand appeal.

¶79 Further, Mother did not identify these pre-remand issues in the first appeal's petition for review. *See supra* ¶ 19. We require a party appealing from a child welfare decision to identify in its petition "the legal issues presented" and "argument for each issue raised." UTAH R. APP. P. 55(d)(5)–(6). But Mother's petition identified only two issues: one relating to the juvenile court's view of a mental health assessment and a therapist's testimony, and another challenging to the court's best interest determination. With Mother having narrowed her appeal to only these two issues, there is no basis upon which we could read into her stipulation a reservation of the due process and DCFS issues she now seeks to raise.

¶80 Finally, we briefly address Mother's claim that this case has been "infected by structural errors that permeated the trials." Of particular note, Mother contends that the juvenile court's 2019 decision to excuse her from the proceedings before she was appointed a lawyer adversely affected her throughout.[10] While we are troubled by Mother being unrepresented for nearly a year and a half into these proceedings, this is not an error we could reach. "We cannot fabricate the power to hear a case simply because it seems more palatable than acknowledging that we lack jurisdiction." *Copper Hills Custom Homes*, 2018 UT 56, ¶ 2 (cleaned up).

II. THE JUVENILE COURT DID NOT ERR IN FINDING THAT TERMINATION OF MOTHER'S PARENTAL RIGHTS WAS STRICTLY NECESSARY TO PROMOTE J.A.C. AND A.E.C.'S BEST INTEREST

¶81 For a juvenile court to terminate parental rights, it must find grounds for termination and that "termination of parental rights, from the child's point of view, is strictly necessary to

---

[10] When the juvenile court case was opened in October 2019 and the court excused Mother from the proceedings so that she could travel to Turkey, Mother had requested the appointment of counsel. After returning to the United States, Mother filed an affidavit of indigency in November 2020, but the court did not appoint counsel until February 2021. Mother, however, was represented by counsel during both trials and appeals.

promote the child's best interest." UTAH CODE § 80-4-301(1).[11] The law deems this best interest determination to be "of paramount importance" to the court's decision once grounds for termination are found. *Id.* § 80-4-103(2)(c); *see also id.* § 80-4-104(12)(a) (stating that although family life should be preserved "[w]herever possible," once a court finds that a parent is unfit or incompetent, the child's welfare and best interest must be the court's paramount concern). And because "termination is permissible only when strictly necessary to promote the child's best interest, the juvenile court must consider whether the child can be equally protected and benefited by an option other than termination." *In re D.S.*, 2025 UT 11, ¶ 39, 568 P.3d 1060 (cleaned up). "If other available options equally promote the child's best interest, then termination is not strictly necessary." *Id.* (cleaned up).

¶82 Mother contends that the juvenile court erred in terminating her parental rights because, she argues, the clear weight of the evidence demonstrated that termination was not strictly necessary nor in the children's best interest. To support this contention, she points to three alleged subsidiary errors. First, she contends that "the juvenile court erroneously discounted the boys' testimony." Second, she contends that the court's factual findings about her present ability to parent are against the clear weight of the evidence. And third, she contends that termination of her parental rights was not strictly necessary to promote the children's best interest "where a permanent custody and guardianship arrangement had been working for two years."[12]

---

[11] The Legislature has both amended and recodified the law applicable to parental terminations since the State brought its petition to terminate in 2019. Because none of the parties contend that these revisions are material to our decision, we cite the current law for the reader's convenience.

[12] Separate from but related to the first subsidiary issue, Mother contends that the juvenile court should have considered the potential that J.A.C., who at the time of the second trial was almost twelve, "would not consent to an adoption, which would legally orphan him." *See* UTAH CODE § 81-13-212(1)(a) (requiring the consent of a child adoptee who is at least twelve years old and has the mental capacity to consent). The GAL argues that this issue is not properly before us because it was not preserved in the juvenile

(continued . . .)

¶83 In reviewing a juvenile court's best interest determination, we must show deference to that decision, and we may overturn it only if we conclude that it is against the clear weight of the evidence. *See In re A.H.*, 2024 UT 26, ¶ 65, 554 P.3d 969. In other words, we will not overturn a juvenile court's best interest determination unless there are "significant flaws in that court's reasoning" or "specific facts in the record that the juvenile court had misunderstood or failed to consider, and that tip[] the scales in the other direction." *Id.*

¶84 In making this assessment, we are mindful of the clear and convincing burden of proof that governs the juvenile court's decision. *See* UTAH CODE § 80-4-103(2)(a). That is, we "assess whether the juvenile court's determination that the 'clear and convincing' standard had been met goes against the clear weight of the evidence." *In re G.D.*, 2021 UT 19, ¶ 73, 491 P.3d 867. We also guard against simply substituting our judgment for the judgment of the juvenile court. A "juvenile court has had the opportunity to observe the testimony and assess the respective credibility of the witnesses," and it may "gain additional insight" because of the opportunity it has to see the case progress over time. *In re D.S.*, 2025 UT 11, ¶ 58. Thus, even if we would weigh the evidence differently or reach a different result, we will not reverse the juvenile court unless these standards are met. *Id.* ¶¶ 58 & n.7, 62.

A. *Mother Has Not Shown that the Juvenile Court Erred in Its Assessment of the Children's Testimony*

¶85 Mother contends that termination of her parental rights "was not in the boys' best interest because they both clearly testified that they wished to have an ongoing relationship with [her]." Specifically, she points to J.A.C.'s testimony that he changed his mind about adoption because he wanted to give Mother "one more chance." And she references A.E.C.'s testimony that he wanted visits (but not calls) from Mother. Mother claims that these opinions were "improperly discounted" by the juvenile court.

---

court. Mother does not dispute this contention or identify where in the record the issue was raised. *See* UTAH R. APP. P. 55(d)(5) (requiring appellants in child welfare appeals to identify in the petition on appeal how their issues were preserved). Accordingly, we deem the issue waived. *See In re D.S.*, 2025 UT 11, ¶ 64 (stating that an issue not raised in the juvenile court is waived and will not be considered on appeal).

¶86 Utah law requires that when a child is not in the physical custody of a parent, the juvenile court must consider the child's desires regarding the termination of that parent's rights as part of the court's best interest inquiry. UTAH CODE §§ 80-4-301(2)(c), -303(1)(a). But that requirement is not absolute. It applies only if the "court determines the child is of sufficient capacity to express the child's desires." *Id.* § 80-4-303(1)(a).

¶87 Here, the juvenile court allowed both boys to testify at trial with the assistance of the GAL. They testified about Mother, their foster home, and their desires regarding adoption. *See supra* ¶¶ 32–33. After hearing their testimonies, the court determined that the boys had sufficient capacity to relate their experiences and feelings about Mother's care and about their foster family. And the court gave some, albeit minimal, weight to J.A.C.'s testimony that he wanted to give Mother another chance. The court, however, did not rely on their testimonies about having a relationship with Mother going forward because it found that neither child had "sufficient capacity to express meaningful opinions about the ultimate outcome of the case."

¶88 In support of that finding, the court pointed to the children's ages of nine and eleven, their developmental delays, and their "[in]complete understanding of what being adopted means." And in defense of its assignment of little weight to J.A.C.'s testimony about living with Mother, the court explained that it did not share his hope that Mother's new husband would help her make better choices because Mother's pretrial actions did not support that view. The court also doubted the motivation behind J.A.C.'s change of heart because it appeared that he perceived Mother as being "all about fun and gifts" and he disliked some of the foster parents' rules. Finally, the court viewed some of J.A.C.'s desires as contradictory and inconsistent with his previous assertions that he wanted to be adopted.

¶89 Mother doesn't challenge any of these factual findings as against the clear weight of the evidence. She doesn't challenge the juvenile court's findings that due to the boys' ages and developmental delays, they lacked the capacity to sufficiently understand what adoption meant.[13] Further, she doesn't challenge

---

[13] Before trial, Mother had shared the juvenile court's view. She had objected to the boys testifying at all and had argued, among

(continued . . .)

the court's findings that J.A.C.'s desires were contradictory and his new interest in living with Mother was inconsistent with his long-expressed desire and was based on questionable reasoning and motives. Instead, to the extent Mother takes issue with these findings, her argument depends on her contention that the court's findings regarding the different facets of the boys' testimonies were inconsistent. But we see three problems with her view.

¶90 First, we disagree with the premise of Mother's argument—that the court's assessment of the boys' capacity to testify was inconsistent. The court thoughtfully explained and drew defensible distinctions between the boys' testimonies about experiences and feelings and the boys' testimonies about the ultimate question of adoption.

¶91 Second, we conclude that Mother cannot show it was improper for the court to discount the boys' testimonies where she hasn't shown that the court clearly erred in finding that the boys lacked "sufficient capacity to express meaningful opinions about the ultimate outcome of the case." The governing statute requires that the court consider a child's desire only if the court determines the child "is of sufficient capacity to express the child's desires." UTAH CODE § 80-4-303(1)(a). Absent a successful challenge to the court's sufficient capacity finding, Mother's challenge cannot succeed.

¶92 Third, Mother asserts that termination of parental rights cannot be in the children's best interest if they value a relationship with their Mother. But Mother's assertion is not supported by law. Although a juvenile court, in some circumstances, must consider a child's desire about the termination of parental rights, *id.*, the statute does not turn the decision over to the child. Rather, the juvenile court must consider a variety of factors in making its best interest determination. *See id.* §§ 80-4-301(2), -303(1), -304. And because Mother has not engaged with the court's comprehensive findings supporting its determination, Mother has not shown that even considering the boys' desires, the court's best interest determination was against the clear weight of the evidence. *See In re A.H.*, 2024 UT 26, ¶ 65.

---

other things, that due to "their age and their maturity, their special needs [are] such that the value or the weight of their testimony would be limited."

B. *The Juvenile Court's Concerns About Mother's Present Parental Fitness Were Not Against the Clear Weight of the Evidence*

¶93   Next, Mother contends that it is not in the children's best interest to terminate her parental rights because she is a presently fit parent, capable of parenting or, at least, "co-parenting" them. To support her claim, she first characterizes three categories of "concerns" noted by the juvenile court: (1) her inability to care for the children's needs and her failure to improve her parenting skills; (2) her uninterest in the children; and (3) her inability to maintain appropriate boundaries with the foster family. She then identifies evidence introduced at trial and argues that the clear weight of the evidence contradicts the court's concerns. Because Mother does not acknowledge the limitations in her cited evidence or other evidence supporting the court's findings, Mother's challenge fails.

¶94   Mother first points to evidence that she (at the time of trial) had been caring for a newborn baby with her husband, and that a caseworker who conducted a walk-through of her home testified there were no concerns of environmental neglect. Mother also cites the testimony of her therapist who could not identify any issues with Mother's ability to care for the children, and the testimony of the foster mother who testified about gifts Mother gave the children. Based on this evidence, Mother asserts that "[t]he State presented no evidence that Mother's parenting ability was deficient or that her relationship with the boys would be harmful."

¶95   But Mother's assertion is belied by the record. The juvenile court made comprehensive findings about the deficits in Mother's parenting abilities and her inability to care for the specific needs of J.A.C. and A.E.C. For example, the court found that Mother is not interested in the medical and developmental needs of the children because she was unaware of them at trial and made no effort to ask about them in her interactions with the children, the caseworker, or the foster parents. This lack of interest concerned the court because the children still have "significant ongoing medical, developmental, and educational needs" stemming from her neglect. Further, the court noted that Mother's uninterest in the children's needs was present throughout the proceedings, and it found that Mother has had the ability to financially support the children but hasn't contributed to their care. The court contrasted her lack of interest with the foster family's willingness to spend its

own income to meet the children's needs, and the sacrifices made by the foster mother to care for them.

¶96  And although the court recognized that Mother has kept contact with the children, it found her interactions to be superficial and limited to having fun and buying the children gifts. She doesn't ask the boys about their needs or progress or try to help them with tasks like homework. The court also found Mother exercised poor judgment about her children's wellbeing when she moved her infant into a home with a registered child sex offender, who she would let move back in with her (and the children, if given the chance).

¶97  Finally, the court acknowledged Mother's efforts to attend therapy. But it also found that Mother has not sought services to address her parenting deficits outside of the therapy "[s]he believed she was required to attend." And while Mother points to her therapist's testimony as evidencing her ability to parent, her therapist testified that he had only met with Mother four times, and when asked if he felt those four sessions were a sufficient basis for him to "adequately assess [Mother's] parenting abilities," he responded "no."

¶98 Based on these and other findings, the juvenile court determined that the termination of Mother's parental rights was in the children's best interest. Although Mother identifies evidence that shows some present fitness to parent, Mother has not shown that the court's concerns about Mother's ability to parent J.A.C. and A.E.C. were against the clear weight of the evidence. Further, Mother has not shown that the limited evidence she cites about her present fitness overwhelms the evidence supporting the court's overall best interest determination.[14]

---

[14] After all, the existence of some present ability evidence is not dispositive. "The weight which a juvenile court must give any present ability evidence is necessarily dependent on," among other things, "the amount of time during which the parent displayed an unwillingness or inability to improve . . . her conduct and on any destructive effect the parent's past conduct . . . has had on the parent's ability to resume a parent-child relationship." *In re B.R.*, 2007 UT 82, ¶ 13, 171 P.3d 435 (cleaned up), *modified on other grounds by In re E.R.*, 2021 UT 36, 496 P.3d 58.

*C. The Juvenile Court's Conclusion that Termination of Mother's Parental Rights Was Strictly Necessary Was Not Against the Clear Weight of the Evidence*

¶99 Mother lastly contends that the juvenile court's best interest "analysis is flawed" because "termination was not strictly necessary where a permanent custody and guardianship arrangement had been working for two years." Although she recognizes there was no official permanent custody and guardianship arrangement, she describes the two-year period since the foster parents obtained custody of the children as an endorsement of "the co-parenting dynamic." And she argues that her parental rights should not have been terminated because "all the evidence on the record" demonstrates that Mother and the foster parents could "successfully manage" this type of arrangement.

¶100 Contrary to Mother's claim, the record shows that the juvenile court carefully considered a permanent custody and guardianship arrangement and, based on the evidence before it, determined that the children could not "be equally protected and benefited" by that option. *See In re D.S.*, 2025 UT 11, ¶ 39 (cleaned up). Mother would prefer that we reach a different conclusion based on the evidence, but absent a showing that the juvenile court's findings are against the clear weight of the evidence, we must affirm. *See In re A.H.*, 2024 UT 26, ¶ 65.

¶101 To begin, we note that Mother does not suggest that custody of the children should be returned to her. Instead, we understand Mother to be asking for a third trial so that she can persuade the court to order permanent custody and guardianship. Although such arrangements should be considered when feasible, they can present unique difficulties. As our court of appeals has recognized, "long-term guardianship arrangements are typically only in a child's best interest where the guardians and the parent have a working, relatively healthy relationship in which they are both willing to work together to preserve the parent-child relationship and where the child has a healthy relationship with both the guardian and the parent." *In re K.R.*, 2023 UT App 75, ¶ 15, 533 P.3d 1165 (per curiam) (cleaned up). Thus, "when a parent and guardian have little to no relationship, the particular circumstances of the case may indicate that permanent custody and guardianship will not meet the children's needs as well as termination of parental rights." *Id.* (cleaned up).

¶102 Here, the juvenile court's findings about the children's best interest mirror these observations. In considering a permanent custody and guardianship arrangement with the foster parents, the court concluded that the option would *not* equally protect and benefit the children due to the lack of a good working relationship between Mother and the foster parents, Mother's failure to understand or respect boundaries, Mother's parenting deficiencies, and the children's lack of capacity to distinguish between the roles of guardian and parent.

¶103 As an example of Mother not respecting the foster parents' boundaries, the court recounted testimony about an in-person visit Mother had with the children. It found that Mother had taken off work and planned to travel to Tennessee to have an in-person visit, only informing them about her plans weeks before. When the foster parents told Mother they would be out of state visiting family, Mother "invited herself to meet them" there. Although the foster parents allowed the visit, the court agreed with the foster parents' view that this intrusion crossed appropriate boundaries.

¶104 The court also credited testimony about Mother repeatedly exceeding the monetary limit the foster family had set for the children's gifts. And it concerned the court that Mother had (even at the time of trial) only partially followed the rules and restrictions imposed by DCFS. The court found that to the extent Mother complies with boundaries, it is only "because she believes she has to," and that "[w]ithout the authority of the court and the state setting boundaries it is likely [Mother] would not comply with any limits set by the foster parents."

¶105 Related to these concerns, the court also found that Mother had made plans to move to Tennessee if the court ordered a permanent custody and guardianship arrangement. While the intention may be admirable, it concerned the court that Mother had made plans without discussing the move with the foster parents or DCFS. The court found that Mother was "oblivious to even the possibility" that such a move could create tension, disruption, or difficulty for the children. Her plan only underscored the court's view that Mother is still lacking in basic parenting skills and "is devoid of insight into the needs of these children."

¶106 Finally, the court found that the children "lack the capacity to distinguish between the roles of guardian and parent" and that they would likely be confused by "[M]other's intrusion

across boundaries and failure to reinforce the rules of the foster home" if the court ordered permanent custody and guardianship. The court also found that it was "imperative that [the foster parents] have full authority to set and enforce appropriate limits," and that they would not enjoy that authority if Mother continued to have residual rights.

¶107　Mother has not fully accounted for these findings or the testimony the juvenile court relied on. Nor has she explained how, given the juvenile court's concerns, a permanent custody and guardianship arrangement equally protects and benefits the children as compared to termination. Thus, Mother has not persuaded us that the juvenile court's determination is against the clear weight of the evidence.

## CONCLUSION

¶108　The GAL contends that we lack appellate jurisdiction over this appeal, so we retain only the authority to dismiss it. We disagree. We decide, based on our precedent, that any jurisdictional defects present in Mother's prior appeal cannot be challenged in this subsequent appeal. For similar reasons, we conclude that although we have appellate jurisdiction to hear Mother's present appeal, we have jurisdiction over only her challenges based on errors that occurred after remand from her first appeal. We therefore reach only the merits of Mother's challenge to the juvenile court's best interest determination in its December 17 order. And because Mother has not shown that the court committed reversible error or that its decision was against the clear weight of the evidence, we affirm.

––––––––––

JUSTICE NIELSEN, concurring

¶109　I join fully in the court's opinion but write separately to discuss a little further the counterintuitive result in Part I: how it is that we can lack jurisdiction over the wrongly remanded August 3 order and what preceded it but not lack jurisdiction over the remand proceedings stemming from that faulty remand order. It seems at first glance that this entire appeal is built on jurisdictional sand and must fall. But it only seems that way.

¶110　The culprit is that "slippery" word, "jurisdiction," *State v. Rettig*, 2017 UT 83, ¶ 36, 416 P.3d 520 (cleaned up), a word with "many, too many, meanings," *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 90 (1998) (cleaned up). Sometimes it means the limits

on what relief a court can award. *Rettig*, 2017 UT 83, ¶ 36; *see also In re Adoption of B.B.*, 2017 UT 59, ¶ 125, 417 P.3d 1 (Lee, A.C.J., opinion of the court in part). Sometimes it means the court's territorial limits. *In re Adoption of B.B.*, 2017 UT 59, ¶ 126 (Lee, A.C.J., opinion of the court in part). Sometimes it means complying with procedural rules that limit a court's ability to hear a particular case. *See Rettig*, 2017 UT 83, ¶ 35; *see also A.S. v. R.S.*, 2017 UT 77, ¶¶ 32–36, 416 P.3d 465; UTAH R. APP. P. 4(a). Sometimes it means some other limit. *See* Scott Dodson, *Jurisdiction and Its Effects*, 105 GEO. L.J. 619, 621 (2017) (describing jurisdiction as "a structural concept that helps allocate cases, define boundaries, and maintain relationships among competing forums").

¶111   So jurisdiction means a limit of some kind. But not all limits are created equal; "jurisdiction's effects are separate from its label; a jurisdictional limit—just like a nonjurisdictional limit—could have some, all, or none of the effects commonly tied to jurisdiction." *Id.* at 622. Some (like personal jurisdiction) can be gotten around through waiver or stipulation. *See* UTAH R. CIV. P. 12(h), (b)(2) (providing that a party "waives all defenses and objections not presented," including the defense of "lack of jurisdiction over the person"); *see, e.g.*, *State v. All Real Prop., Residence & Appurtenances*, 2005 UT 90, ¶¶ 8–11, 127 P.3d 693 (holding that a failure to raise an objection to personal jurisdiction or defective notice at first opportunity in a proceeding results in waiver or forfeiture of the defense); *Phone Directories Co. v. Henderson*, 2000 UT 64, ¶ 15, 8 P.3d 256 (noting that "parties who stipulated to personal jurisdiction waived any right to assert a lack of personal jurisdiction" (cleaned up)), *holding modified by In re. W.A.*, 2002 UT 127, 63 P.3d 607. Others can be met by simply complying with applicable rules like deadlines. *See, e.g.*, UTAH R. APP. P. 4. Still others (justiciability concerns like mootness and ripeness), can be avoided by having a proper party seek legally available relief.

¶112 But among its doctrinal siblings, "[s]ubject-matter jurisdiction is special" and "distinct" because it cannot be gotten around or complied with by any party. *In re Adoption of B.B.*, 2017 UT 59, ¶ 128 (Lee, A.C.J., opinion of the court in part); *see also State v. Brown*, 2021 UT 11, ¶ 10, 489 P.3d 152 ("[T]his Court may not obtain jurisdiction of the subject matter of an appeal by consent, waiver, or in the interest of judicial economy.") (citing *Breitenfeld v. Sch. Dist. of Clayton*, 399 S.W.3d 816, 820. n.3 (Mo. 2013)). Nor does it appear to expire; without it, any resulting decision is void and

vulnerable to both direct and collateral attack. *See Migliore v. Livingston Fin., LLC*, 2015 UT 9, ¶¶ 25–26, 347 P.3d 394; Utah R. Civ. P. 60(b)(4), (d).[15]

¶113 The concept of subject-matter jurisdiction is—and should be—a narrow one, including statutory and constitutional "limits on the class of cases assigned to the authority of a certain court." *In re Adoption of B.B.*, 2017 UT 59, ¶ 129 (Lee, A.C.J., opinion of the court in part). It's true that in *B.B.*, the court also included justiciability doctrines in the subject-matter jurisdiction category. *Id.* But I see subject-matter jurisdiction more narrowly than that— it is class-specific rather than case-specific; it is about the kind of cases that the court can hear, not whether it can hear a particular case within that class.[16]

¶114 By my definition, the jurisdictional defect here—an untimely notice of appeal—was not a defect in *subject-matter* jurisdiction because it merely affected one case rather than a whole class of cases. Some deadlines are jurisdictional, some are not. *See generally Kontrick v. Ryan*, 540 U.S. 443, 455 (2004) ("Clarity would be facilitated if courts and litigants used the label 'jurisdictional'

---

[15] Three caveats. One, a reminder that just because a court order is void does not mean that the party can refuse to comply with it while it stands—it is binding until undone. *See United States v. United Mine Workers of Am.*, 330 U.S. 258, 289–95 (1947); *see also Olsen v. Bd. of Educ. of Granite Sch. Dist.*, 571 P.2d 1336, 1338 (Utah 1977) ("The general rule of law is that a judgment may not be drawn in question in a collateral proceeding . . . ."). Two, under the Full Faith and Credit Clause, the ability of another state to question the original forum state's subject-matter jurisdiction is restricted by finality in the same way that non-subject-matter jurisdictional concerns are, so long as the original forum "fully and fairly litigated and finally decided" it. *Durfee v. Duke*, 375 U.S. 106, 111–12 (1963). And three, as discussed below, I say "appear" here because I am not prepared to say definitively at this point that finality can never trump subject-matter jurisdiction concerns.

[16] Because justiciability concerns are case-specific, they do not fall within my definition of subject-matter jurisdictional issues. But that is not to say that they cannot produce the same effects as a subject-matter jurisdictional defect—at least at trial or on direct appeal. As noted, a jurisdictional label is separate from its effects. Scott Dodson, *Jurisdiction and Its Effects*, 105 Geo. L.J. 619, 622 (2017).

not for claims-processing rules, but only for prescriptions delineating the classes of cases (subject-matter jurisdiction) and the persons (personal jurisdiction) falling within a court's adjudicatory authority."). Sometimes the legislature or the court defines time limits as jurisdictional. *See, e.g.*, *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 510, 515–16 (2006); *see also* Dodson, 105 Geo. L.J. at 631 (discussing positivist view of jurisdiction). And we admittedly have used the subject-matter-jurisdiction label for untimeliness and similar defects. *See Amundsen v. Univ. of Utah*, 2019 UT 49, ¶ 50, 448 P.3d 1224 (holding that lack of timely notice of claim deprived court of subject-matter jurisdiction); *Gudmundson v. Del Ozone*, 2010 UT 33, ¶ 17, 232 P.3d 1059 (referring to timeliness-of-appeal issue as one of subject-matter jurisdiction); *see also In re Adoption of B.B.*, 2017 UT 59, ¶¶ 19–35 (Himonas, J., dissenting in part) (categorizing a failure to comply with a statutory prerequisite to relief as going to subject-matter jurisdiction); *Varian-Eimac, Inc. v. Lamoreaux*, 767 P.2d 569, 570–71 (Utah Ct. App. 1989) (characterizing time limit as subject-matter jurisdiction); *see also Gonzalez v. Thaler*, 565 U.S. 134, 169 (2012) (Scalia, J., dissenting) (classifying failure to file timely notice of appeal as a claims-processing rule that was jurisdictional and arguing that "[t]he proper dichotomy is between claims-processing rules that are jurisdictional, and those that are not"). *But see A.S.*, 2017 UT 77, ¶ 35 n.12 (reserving question of whether "the timeliness of an appeal . . . is a matter of 'appellate jurisdiction' or 'subject matter jurisdiction'").

¶115   But that is a misnomer. *See Arbaugh*, 546 U.S. at 510 ("Time prescriptions . . . are not properly typed 'jurisdictional.'" (cleaned up)). The confusion is understandable, because the effect of its lack on direct appeal is the same. But not having jurisdiction over that particular case does not deprive any court of jurisdiction over the class of cases that it falls into. *See State v. Maldonado*, 223 P.3d 653, 655 (Ariz. 2010) (en banc) (noting that "a court that lacks subject matter jurisdiction cannot adjudicate the action," but holding that a procedural error prohibiting entry of judgment "does not mean that the court lacks subject matter jurisdiction"). *But see A.S.*, 2017 UT 77, ¶ 35 n.12 (characterizing appellate jurisdiction as class-specific and subject-matter jurisdiction as case-specific).

¶116   The distinction matters because finality interests differ. The portion of a case built on something other than lack of subject-matter jurisdiction is not subject to collateral attack, but a case built on the lack of subject-matter jurisdiction may be. *State v. Hamilton*,

2003 UT 22, ¶ 25, 70 P.3d 111 ("With rare exception, when a court *with proper jurisdiction* enters a final judgment, . . . that judgment can only be attacked on direct appeal." (emphasis added)). We implicitly recognized this distinction in the result we reached in *A.S.* There, the two parents in a termination case appealed too early, but rather than dismissing for lack of jurisdiction, the court of appeals issued an opinion affirming the juvenile court. *A.S.*, 2017 UT 77, ¶ 3. Because neither party sought certiorari or otherwise raised the jurisdictional defect, we held that during a later appeal from the same case, the parents were "foreclosed from arguing that the court of appeals lacked jurisdiction" over the first appeal, and we treated it "as a final judgment." *Id.* This followed from the claim-preclusion branch of res judicata, which showed that "the ability to raise questions of jurisdiction expires after the last available opportunity to appeal final judgments on a particular set of issues has passed." *Id.* ¶ 3 n.2.

¶117    If by "questions of jurisdiction," we meant questions of jurisdiction *other than subject-matter jurisdiction* (as narrowly defined here), then I agree. It makes sense to read *A.S.* that way because it was that type of jurisdiction at issue in *A.S.* And it makes sense to apply *A.S.*'s rule here because that is the type of jurisdiction at issue here. But it could be a different matter if we faced a question of subject-matter jurisdiction as I have defined it above.[17] Of course, a lack of subject-matter jurisdiction in a lower court will be rare in state court, where (unlike federal courts) we have trial courts of general jurisdiction. *See* UTAH CODE § 78A-5-102(1) ("Except as otherwise provided by the Utah Constitution or by statute, the district court has original jurisdiction in all matters civil and criminal."). But never say never—Murphy's Law applies to the law as much as to anything else.

¶118    With so much jurisprudential water under the bridge, I cannot hope to construct a concise distinction for jurisdiction that will prevent any confusion that the term can bear; it's simply too

---

[17] Or perhaps not. *See Chicot Cnty. Drainage Dist. v. Baxter State Bank*, 308 U.S. 371, 376 (1940) (holding that question of subject-matter jurisdiction could "not be assailed collaterally"). I would await briefing and argument on the subject before finally deciding. I merely point out that the kind of jurisdiction at issue is relevant to consider in deciding finality, and may even be dispositive.

context-dependent.[18] But I've written separately to offer this thought: a good way to think about jurisdiction in the finality context is as either categorical or case-specific. Subject-matter jurisdiction is categorical (the kind of case that a court can hear) and its lack renders a judgment void and subject—at least to some degree—to collateral attack. Case-specific jurisdictional concerns (like proper service invoking personal jurisdiction, compliance with deadlines, or justiciability concerns based on the particular parties) makes a judgment merely *voidable*. If these types of concerns are raised timely, the judgment can be undone; but if not, finality prevails.

———————

[18] Not to say that others haven't tried; there is a good deal of academic debate on the subject and attempts to categorize the concept. *See, e.g.*, Dodson, 105 Geo. L.J. at 633–36 & nn.98–102.